Marc L. Godino (SBN 182689)
Jonathan M. Rotter (SBN 234137)
**GLANCY PRONGAY & MURRAY**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Phone: (310) 201-9150
Fax: (310) 432-1495
Email: mgodino@glancylaw.com
Email: jrotter@glancylaw.com

[Additional Counsel on Signature Page]

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

KIMBERLY SCOTT, ROBIN WARBEY, JACOB DAVIS, MARCOS RAMOS, and DANIEL SMITH, on Behalf of Themselves and All Others Similarly Situated,

Plaintiffs,

v.

COSTCO WHOLESALE CORPORATION,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Kimberly Scott, Robin Warbey, Jacob Davis, Marcos Ramos, and Daniel Smith (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Costco Wholesale Corporation (the "Defendant" or "Costco"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    Costco controls and operates https://costco.com/ (the "Website" or "Costco Website"). The Website provides users, such as Plaintiffs and Class Members, with access to various goods, including food, cosmetics, health-related goods, and prescription medications.  Using the Website, Tracked Users can fill prescriptions (the "Rx Users"), purchase sensitive health-related goods (the "Purchasers"), and browse sensitive health-related goods (the "Browsers" and collectively with the Rx Users and Purchasers, the "Tracked Users").   The Website offers the option for Tracked Users to search for goods which can be purchased from local Costco store locations or purchased and delivered directly to the Tracked User.

2.    To use the Website's search function (the "Search Bar"), Tracked Users type search queries or search terms (the "Queries") into the Search Bar. The Search Bar can be used to search for specific goods on the Website.  After typing and submitting Queries into the Search Bar, lists of results are obtained from the Website and displayed to its Tracked Users.

3.    Unbeknownst to Tracked Users, Costco employs tracking tools on the Website which intercept communications between Tracked Users and the Website.  Meta's pixel (the "Pixel" or "Facebook Pixel" or "Meta Pixel"), is a tracking tool which was created by Meta (also referred to as "Facebook" or the "Tracking Entity") to send the Tracking Entity information relating to Tracked Users' searches and activity on any website that installed it, including the Costco Website.

4.    Further, when Tracked Users click on specific items on the Website, detailed descriptions of each item are shared with the Tracking Entity, and these details are shared *again* when Tracked Users add items to their carts.

CLASS ACTION COMPLAINT

5.    By sharing the items that Tracked Users search for, browse, and add to cart, Defendant shares protected private health information ("PHI") with the Tracking Entity.[1]

6.    The Website does not provide Tracked Users with notice that the Website's use of a Search Bar would cause their Queries to be shared with the Tracking Entity, that viewing items or adding items to a cart will result in detailed information about those items being intercepted by the Tracking Entity, or that such interceptions will be used to benefit the Defendant and Tracking Entity separate from the services being rendered to the Tracked User.[2]

7.    Nor does Costco obtain Tracked Users' consent to its disclosure practices prior to Tracked Users' use of the Website.

8.    Tracking tools, such as the Meta Pixel, improve the value of advertising by collecting and analyzing Tracked User data to determine interests, lifestyles, demographics, and other relevant categorizations to ensure relevant ads reach Tracked Users.  This value can be monetized by using this information to sell advertising across multiple websites to marketing firms looking to target Tracked Users based on their use of the Website or demographics.

9.    In short, the Tracking Entity receives a benefit, independent of the benefit conferred on Defendant, by using the information it obtains through tracking Tracked Users' interactions on the Website to increase the value of the advertising it sells to various parties.

---

[1] For example, Tracked Users may reveal symptoms, illnesses, health conditions, and family-planning status (*i.e.*, pregnancy) by using the Website to search for or purchase medical goods or prescriptions from the Website.

[2] Interception of Tracked Users' communications with Defendant's Website will also be used outside of the Website by Tracking Entity to target Tracked Users with advertising sold to advertising purchasers, as discussed, *infra*, in ¶¶ 53-57.

10.    A data sharing policy for a website or online store is an important factor for individuals deciding whether to provide personal information to that website.

11.    Federal and California legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

12.    Congress passed the Wiretap Act, which prohibits the unauthorized interception of electronic communications.

13.    California passed its Invasion of Privacy Act ("CIPA"), which attaches liability to any person who intercepts who, willfully and without the consent of all parties to a communication, attempts to read or to learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.[3]

14.    Costco purposefully implemented and utilized various tracking tools on its Website, including the Meta Pixel.

15.    The Website does not obtain consent to share Tracked Users' Queries with third parties contemporaneously with Tracked Users' search requests.

16.    Costco knew that the search feature used on the Website would gather and share Tracked Users' Queries and Website browsing information to the Tracking Entity, and that the Website did not provide notice of or obtain consent as to such practices.

17.    Thus, Tracked Users have been harmed by Costco, resulting in violations of CIPA.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Costco to immediately (i) remove the tracking tools from the Website, or (ii) add appropriate and conspicuous disclosures about the nature of its Search Bar, and obtain the appropriate consent from Tracked Users.

---

[3] Cal. Penal Code § 631(a).

18.    Plaintiffs also had their privacy interests violated.

19.    Tracked Users of the Website, such as Plaintiffs, have an interest in maintaining control over their private and sensitive information, such as their Queries, as well as an interest in preventing their misuse.

20.    Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of Tracked Users for violations of CIPA, Cal. Penal code § 631(a), breach of implied contract, breach of fiduciary duty, and for violating the privacy rights of Plaintiffs and Tracked Users.

21.    Defendant violated the Tracked Users' privacy interests the moment, and each time, Plaintiffs and Tracked Users entered and submitted Queries via the Website's Search Bar, clicked on individual products within the Website, and added those products to their digital shopping cart, each of which independently resulted in PHI being intercepted by the Meta Pixel.

## **PARTIES**

22.    Plaintiff Kimberly Scott is a resident of Van Nuys, California. At various points throughout the past several years, Ms. Scott visited Defendant's Website for the reasons outlined below. During her visits to the Website, Ms. Scott was not provided an opportunity to review or consent to share her personal information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected health information. Ms. Scott utilized the Defendant's Website to fill her prescription in a Microsoft Edge browser on a device that was signed into Facebook, as recently as January 2023 resulting in Ms. Scott's PHI being shared with Facebook. Ms. Scott's Facebook profile included personally identifiable information, including her real name, relationship status, personal photos, birth date, and gender.  Ms. Scott did not consent to Defendant collecting her data while visiting and using the Website.

23.    Plaintiff Robin Warbey is a resident of Sacramento, California. For at least the last several years, Mr. Warbey visited Defendant's Website at various times for the reasons outlined below. During his visits to the Website, Mr. Warbey was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Warbey searched for various items on the Website utilizing Defendant's Website search function, including searching for over-the-counter medications using a Microsoft Edge browser on a device that was signed into Facebook, as recently as September 2023 resulting in Mr. Warbey's PHI being shared with Facebook. Mr. Warbey additionally utilized Defendant's website to refill prescriptions resulting in his PHI being shared with Facebook. Mr. Warbey's Facebook profile included personally identifiable information, including his real name, personal photos, hometown, and gender.  Mr. Warbey did not consent to Defendant collecting his data while visiting and using the Website.

24.    Plaintiff Jacob Davis is a resident of Davis, California. For at least the last several years, Mr. Davis visited Defendant's Website at various times for the reasons outlined below. During his visits to the Website, Mr. Davis was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Davis searched for various items on the Website utilizing Defendant's Website search function, including searching for over-the-counter medications using a Chrome browser on a device that was signed into Facebook, as recently as June or July 2023 resulting in Mr. Davis' PHI being shared with Facebook. Mr. Davis' Facebook profile included personally identifiable information, including his real name, personal photos, city and state of residency, college attended, and gender.

CLASS ACTION COMPLAINT

Mr. Davis did not consent to Defendant collecting his data while visiting and using the Website.

25.     Plaintiff Marcos Ramos is a resident of San Fernando, California. At various times throughout the last several years, Mr. Ramos visited Defendant's Website at various times for the reasons outlined below. During his visits to the Website, Mr. Ramos  was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Ramos searched for various items on the Website utilizing Defendant's Website search function, including searching for over-the-counter medications  and other health goods using a Safari or Chrome browser on a device that was signed into Facebook resulting in Mr. Ramos's PHI being shared with Facebook. Mr. Ramos' Facebook profile included personally identifiable information, including his real name, personal photos, city and state of residency, and gender.  Mr. Ramos did not consent to Defendant collecting his data while visiting and using the Website.

26.     Plaintiff Daniel Smith is a resident of Oakland, California. At various points throughout the past several years, Mr. Smith visited Defendant's Website for the reasons outlined below. During his visits to the Website, Mr. Smith was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Smith searched for various items on the Website utilizing Defendant's Website search function, including searching for over the counter medications  and other health goods using a Chrome browser on a device that was signed into Facebook resulting in Mr. Smith PHI being shared with Facebook. Mr. Smith also utilized the Defendant's Website to fill his prescriptions as recently as August 2023 resulting in Ms. Smith's PHI being shared with Facebook. Mr. Smith's Facebook

profile included personally identifiable information, including his real name, personal photos, and check-in locations. Mr. Smith did not consent to Defendant collecting his data while visiting and using the Website.

27.     Defendant Costco Wholesale Corporation is incorporated in Washington and headquartered in Issaquah, Washington. Costco operates a chain of retail stores in the United States,[4] which sell prescription drugs, over-the-counter medications, health and beauty aids, personal care products, seasonal merchandise, cosmetics, household items, furniture, food, and a variety of other goods.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

29.     This Court has personal jurisdiction over Costco because Costco derives revenue in the State of California, including Costco's revenue generation from its Website, which is hosted on cloud servers across the country, including in the state of California. Further, the harms suffered by Plaintiffs occurred in California as a result of Costco putting tracking software on their computers.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Costco has places of business located in this District and Costco conducts substantial business operations in this District.

---

[4] Costco's reach extends to Washington D.C., Puerto Rico, and every U.S. state excluding Maine, Rhode Island, West Virginia, and Wyoming.

CLASS ACTION COMPLAINT

## COMMON FACTUAL ALLEGATIONS

A.    **Legislative Background**

1.    **California's Invasion of Privacy Act**

31.    CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[5] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[6]

32.    CIPA is regularly recognized as California's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

33.    To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from California.[7]  Notably, for wired communications, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[8]

34.    CIPA also prohibits the manufacture, assembly, sale, offer for sale, advertisement for sale, possession, or furnishment to another of devices which are primarily or exclusively designed or intended for eavesdropping upon the communication of another.[9]

---

[5] Cal. Penal Code § 630.

[6] *Id.*

[7] Cal. Penal Code §§ 631-32.

[8] *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).

[9] Cal. Penal Code § 635.

35.    CIPA claims are often treated as analogous to Wiretap Act claims.

**B.    How Websites (and the Internet) Operate**

36.    Websites are hosted on servers, but "run" on a user's internet browser.

37.    Websites are a collection of webpages, and each webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[10]

38.    Webpages each have a unique address, and two webpages cannot be stored at the same address.[11]

39.    When a user navigates to a webpage (such as entering a URL address directly or clicking a hyperlink containing the address), the browser contacts the DNS server, which translates the web address of that website into an IP address.[12]

40.    An IP (Internet Protocol) address is "a unique address that identifies a device on the internet or a local network."[13] Essentially, an IP address is:

> the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

41.    The user's browser then sends an HTTP Request to the server hosting that IP address via specific Request URL, requesting a copy of the webpage data

---

[10] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited October 17, 2023).

[11] *Id.*

[12] *How the web works*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited October 17, 2023).

[13] *What is an IP Address – Definition and Explanation*, KASPERSKY https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited October 17, 2023).

for that Request URL be sent to the user, which, if approved, receives a HTTP Response that authorizes the HTTP Request and begins the process of sending the webpage's files to the user in small chunks.[14]

42. This Request URL includes a domain name and path, which indicate which content is being accessed on a website and where it is located.

43. The Request URL also typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, usually indicated by the use of a question mark to signal the use of parameters, and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 – Mozilla's diagram of a URL, including parameters[15]*

44. The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[16] This is the visible, and usually interactable, website that most people think of.

C. **Plaintiffs Have a Privacy Right in Their Queries**

45. Companies can easily build profiles of customers based on their consumer habits.

46. Communications shared between consumers and companies, by and through their websites and mobile apps, appear to be private but, in reality, the contents of those messages are regularly, without notice, shared with third parties.

---

[14] *Id.*

[15] *What is a URL?*, MOZILLA, *available at* https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited October 17, 2023).

[16] *Id.*

47.    Here, Costco shares users' information, including Queries, with the Tracking Entity.

48.    Queries are inherently private.  This is particularly true when the searches are communicated in confidence or presumed to be private.  While all Queries are personal in nature, there is an obviously heightened want for the searches to be kept confidential when the Queries themselves contain private health information.

49.    Descriptions and summaries of medical products and Queries relating to such are private information, indicating the health status and concerns of users, information which is federally protected, which Costco candidly admits.[17]

50.    Tracked Users search for, look at, and purchase medical products from the Website using Queries, by viewing medical product webpages, and adding those medical products to their cart.  The Queries, when associated with descriptions of the products, pertain to more than users' basic privacy.

51.    This private information is then shared with various advertising services, including Meta.

**D.    The Tracking Entity Utilizes Tracking Tools to Benefit From Gathering Tracked Users' Information**

52.    As described in Section E, the Website does not notify Tracked Users that their Queries will be surreptitiously intercepted when conducting a search on the Website. There is no conspicuous notice near the Search Bar that would let Tracked Users know that their searches were being tracked, stored, and shared.

53.    The Website's use of the Tracking Entity's tracking tools in Costco's implementation of the Search Bar provides benefits to the Tracking Entity that is independent of the benefit conferred to the Website.

---

[17] *See Costco Health Centers Notice of Privacy Practices,* COSTCO, https://www.costco.com/wcsstore/CostcoUSBCCatalogAssetStore/rx/HIPAA-Privacy-Practice-19.pdf (last visited October 17, 2023).

**1.** **Costco utilized Meta's Pixel to monetize Tracked Users' Queries and Webpage Interactions**

54. Meta offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which then shares these observations with Facebook.

55. The Pixel can only be purposely added by website developers to a website. A website operator must link a related Facebook account with its Pixel, and then add code to each webpage on the website to make use of the Pixel.[18]

56. Costco effectuated the steps to add the Pixel to the Website.

57. The Pixel is employed by website operators to gather, collect, and then share user information with Facebook.[19] Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[20]

58. Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook. Here, the Website shares both.

59. The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, including which webpages the pixel should be added to, which events should be monitored, and what information

---

[18] *How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited October 17, 2023).
[19] The Facebook Pixel allows websites to track Tracked User activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/ (last visited October 17, 2023).
[20] *See Meta Pixel*, FACEBOOK https://www.facebook.com/business/tools/meta-pixel (last visited October 17, 2023).

CLASS ACTION COMPLAINT

is disclosed, including whether such information is concealed using a "hash."[21]

### i.    The Website Implemented the Pixel

60.    To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[22]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[23]

61.    To add an operational Pixel to a website, website operators take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[24]

62.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[25] as well as connect the Pixel to a Facebook Ad account.[26]

---

[21] Hashing takes values of various lengths and converts them to a fixed-length value (based on number of characters), and in this process encrypts the data. *See https://developer.mozilla.org/en-US/docs/Glossary/Hash*

[22] *How to create a Meta Pixel in Business Manager*, FACEBOOK https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited October 17, 2023).

[23] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL https://sproutsocial.com/insights/facebook-business-manager/ (last visited October 17, 2023).

[24] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited October 17, 2023).

63.   To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the Pixel code to the website's code.

64.   Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[27] (v) domain verification, and (vi) configuring web events.[28]

65.   After following these steps, a website operator can start harvesting information using the Pixel.

66.   A Pixel cannot be placed on a website by a third-party without being given access by the website's owner.

67.   Once the Pixel is operational, it can begin collecting and sharing user activity data as instructed by the website developers.

---

[25] *Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited October 17, 2023).
[26] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/622772416185967 (last visited October 17, 2023).
[27] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited October 17, 2023).
[28] *How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited October 17, 2023).
; *see* Ivan Mana, How to Set Up & Install the Facebook Pixel (in 2022), YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited October 17, 2023).

CLASS ACTION COMPLAINT

68.    When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[29]

69.    A Facebook UID can be used, by anyone, to easily identify a Facebook user.

70.    Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### ii.    The Pixel as a Tracking Tool

71.    The Pixel tracks user-activity on web pages by monitoring events which,[30] when triggered, causes the Pixel to automatically send data directly to Facebook.[31]

72.    Examples of Pixel events utilized by websites include: a user loading a webpage with (i) metadata tags assigned to content on the webpage by the website owner (the "MicroData" event),[32] (ii) with a Pixel installed (the

---

[29] *Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited October 17, 2023).#
[30] *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited October 17, 2023).
[31] *See generally Id.*
[32] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited October 17, 2023).

CLASS ACTION COMPLAINT

1    "PageView event"), or (iii) when pre-designated buttons are clicked, such as the

2    "add to cart" button, (the "SubscribedButtonClick" event, collectively, the "Pixel

3    Events").[33]  The Website utilizes the Pixel Events.[34]

4         73.    When a Pixel Event is triggered, an "HTTP Request" is sent to

5    Facebook (through Facebook's URL www.facebook.com/tr/).[35]

6         74.    The HTTP Request includes a Request URL and embedded cookies

7    such as the c_user cookie.  It may also include information in its Payload,[36] such

8    as metadata tags, or it may contain a "parsed" version of the Request URL.[37]

9

10

11

12

---

13  [33] *Meta for Developers: Reference - standard events*, FACEBOOK
14  https://developers.facebook.com/docs/meta-pixel/reference/ (last visited October
     17, 2023).
15  [34] The presence of Pixel events, such as the Microdata, PageView, and AddToCart
16  events, can be confirmed by using the publicly available and free Meta Pixel
     Helper tool.  *See About the Meta Pixel Helper*, FACEBOOK
17  https://www.facebook.com/business/help/198406697184603?id=12053766828321
18  42 (last visited October 17, 2023).
     [35] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-
19  your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited October
     17, 2023).
20  [36] The "request payload" (or more simply, "Payload") is data sent by a HTTP
21  Request, normally through a POST or PUT request, where the HTTP Request has a
     distinct message body.  Payloads typically transmit form data, image data, and
22  programming data.  *See https://doc.sitespect.com/knowledge/request-payload-*
23  *trigger.*
     [37] Data in request headers and payload headers is often unreadable and
24  unstructured, which is why internet browsers and other software "convert data into
     a more readable and organized format, helping to extract relevant information
25  while investing minimal time in interpreting a data set.  *See What is Data*
26  *Parsing?*, TIBCO https://www.tibco.com/reference-center/what-is-data-
     parsing#:~:text=Data%20parsing%20is%20converting%20data,challenging%20to
27  %20read%20and%20comprehend
     (last visited October 17, 2023).
28

CLASS ACTION COMPLAINT

### iii.    The Pixel Shares Tracked Users' Website Interactions

75.    When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[38]

76.    The URL's path contains information about user activity, such as which content is searched for or clicked, in addition to the parameters.

77.    By way of example, the following screenshots depict how parameters are used to share Queries and how the URL path mirrors the name of the product being viewed on the Website:



*Figure 2 - Costco website uses URL parameters to convey Query information*[39]

---

[38] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited October 17, 2023).

[39] *Search Results: Diabetes*, COSTCO https://www.costco.com/CatalogSearch?dept=All&keyword=diabetes (last visited October 17, 2023).

CLASS ACTION COMPLAINT



*Figure 3 – Costco Website discloses product information through URL Path⁴⁰*

78.    The parameters and/or path for a Request URL may include the category or name of a product being searched for, depending on what Queries a Tracked User uses in the Search Bar.

79.    The PageView, Microdata and SubscribedButtonClick events disclose Tracked Users' Request URLs, leading to the PageView and Microdata event disclosing Tracked Users' Queries and the SubscribedButtonClick events disclosing items Tracked Users add to their carts, as depicted below:

---

⁴⁰ *Nature Made Diabetes Health Pack, 60 Packets*, COSTCO https://www.costco.com/nature-made-diabetes-health-pack%2c-60-packets.product.11661873.html (last visited October 17, 2023).



*Figure 4 - PageView event triggered on the Website, disclosing Query to Facebook*



*Figure 5 - Microdata event triggered on the Website, disclosing Query to Facebook*

*Figure 6 - SubscribedButtonClick tracks when Tracked Users add identified items to their Costco Website carts*

80.    The Microdata event, as used by Defendant, is also used to disclose product descriptions with various types of information: title of a product, description of a product, stock status, product SKU, currency, and even reviews of the product.

81.    Costco assigns these descriptions as depicted below:

*Figure 7 - Microdata event transmission, including product name and description in Request URL and meta data*[41]

82.    Microdata events are triggered whenever a product web page with assigned metadata tags is loaded.

83.    When a Microdata event is triggered, it sends a request to Facebook containing data, including, but not limited to, its properties, as depicted above in Figure 7.

84.    When a "c_user" cookie is in place, the Pixel Events' requests include users' c_user cookies by copying the c_user cookie into the Request Header, as depicted below:

---

[41] *Nature Made Diabetes Health Pack, 60 Packets*, COSTCO
https://www.costco.com/nature-made-diabetes-health-pack%2c-60-packets.product.11661873.html (last visited October 17, 2023).

21

CLASS ACTION COMPLAINT

*Figure 8 - Embedded c_user cookie in Pixel Request transmitted to Facebook via Microdata event[42]*

85.    The Pixel Events, when triggered, independently and automatically result in the sharing of a user's website interactions (including PHI) and Facebook UID with Facebook.

86.    Thus, PHI of Plaintiffs and the Class Members have automatically been shared with Facebook as a result of Costco's decision to add the Pixel to the Website.

87.    As described above, the Pixel captures information on the Website and sends that information to Meta through triggered Pixel Events.

88.    The Pixel passed this information through the HTTP Requests sent to facebook.com/tr.

---

[42] *Id.*

89.     The Pixel intercepted and shared PHI related to medical products sought by, viewed by, and added to cart by Plaintiffs.

90.     The Pixel is active across the Website, including medical product pages, as implemented by Costco.

91.     When a Tracked User views or interacts with those medical products on the Website, those actions are intercepted and monetized by the Tracking Entity.

**iv.     The Pixel Transmissions Are Sent To California**

92.     As discussed in paragraph 83 and depicted in Figure 8, Pixel transmissions are sent to www.facebook.com/tr.

93.     The IP address associated with the domain www.facebook.com can be obtained through pinging the URL, as depicted below:



94.     Using the IP address 157.240.11.35, IP address look up tools show that the server associated with that IP address is located in California, as depicted below:

CLASS ACTION COMPLAINT

*Figure 9 - Search result obtained by using facebook.com IP address*[43]

**E.    Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Website Activity**

95.    Plaintiffs and Class members were unaware of the tracking tools intercepting their confidential communications with the Website.

96.    Plaintiffs and Class members reasonably believed that communications to the Website were made in confidence and that they would not be shared with third parties.

97.    The terms to the website are attached in a browsewrap format, with a hyperlink at the bottom of the page, which users must scroll to the very bottom of a large webpage to see, as depicted below:

---

[43] *IP Details For: 157.240.11.35*, WHATISMYIPADDRESS
https://whatismyipaddress.com/ip/157.240.11.35 (last visited October 17, 2023).



98.     While the Terms and Conditions are quiet as to the handling of protected health information, the Privacy Notice explains that "protected health information is covered by the "Health Care Centers and Pharmacy" section of the agreement (the "Health Center Notice").[44]

---

[44] *Costco Wholesale Corporation Your Privacy Rights*, COSTCO https://www.costco.com/privacy-policy.html (last visited October 17, 2023).

99.    The Health Center Notice itself notes a limited range of use for PHI, and that Costco "must obtain . . . written authorization" for any uses beyond the enumerated list provided by Costco in its Health Center Notice.[45]

100.    Costco provides examples of the types of use of PHI that require written authorization, including "marketing," which Costco defines as "making a communication about a product or service that encourages [users] to purchase the product or service."[46]

101.    Costco's use of the Pixel is definitively "marketing" under Costco's definition, as it transmits users' PHI to Facebook to improve the effectiveness of advertising targeting those subscribers.

102.    Contrary to their own Health Center Notice, Plaintiffs were not provided notice of, let alone given an opportunity to provide written consent to, the tracking tools' interception of Plaintiffs' Queries, webpage interactions, and/or cart activity.

103.    Facebook guides and cautions website operators of the dangers of using its tracking tools without first providing notice of and then obtaining valid consent for invasively collecting Plaintiffs' protected data and either making that data available to third-parties or allowing third parties to intercept Plaintiffs' protected information.  Costco agreed to these terms, directly or as the effective owner of the Website, in order to utilize and employ the tracking tools.

104.    For example, to use Meta's Facebook Pixel, the owner or operator of the website must accept Meta's Commercial Terms and Business Tools Terms. Meta explicitly states that the employment of the Pixel will result in data sharing,

---

[45] *Costco Health Centers Notice of Privacy Practices*, COSTCO https://www.costco.com/wcsstore/CostcoUSBCCatalogAssetStore/rx/HIPAA-Privacy-Practice-19.pdf (last visited October 17, 2023).
[46] *Id.*

including with Meta[47] through the automatic sharing of Pixel Event information and contact information. *Id.* Meta directs parties implementing the Pixel – here, Costco – to encrypt request information[48] *before* data can be shared. *Id.* Meta even provides Pixel implementers guidance on responsible data handling, which explains how data is acquired, used, and stored, including which information is shared with Meta. More significantly, Meta instructs Pixel users to ensure the acquisition of any rights, permissions, or consents, before sharing information with any third-party.[49]

105. In contravention to Meta's terms and guidance, Plaintiffs were not given notice of the use of the tracking tools on the Website, including Meta's tracking products and services.

106. As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their data when communicating Queries to the Website, viewing products on the Website, or adding items to their digital carts on the Website.

## TOLLING

107. The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Costco's conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

---

[47] *Meta Business Tools Terms*, Facebook https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited October 3, 2023).
[48] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Lee has specifically chosen the Pixel method which makes users' information visible. *See Id.*
[49] *Best Practices for Privacy and Data Use for Meta Business Tools*, Facebook https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited October 17, 2023).

108.   As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Website that Costco was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Costco's unlawful conduct with reasonable diligence.

109.   Costco secretly incorporated the Tracking Entity' tracking tools into the Website, providing no indication to Tracked Users that their communications would be disclosed to these third parties.

110.   Costco had exclusive and superior knowledge that the Tracking Entity' tracking tools incorporated on its Website would disclose Tracked Users' protected and private information and confidential communications, yet failed to disclose to Tracked Users that by interacting with the Website that Plaintiffs' and Class Members' Queries, PHI, and website interactions would be disclosed to third parties.

111.   Plaintiffs and Members of the Classes could not with due diligence have discovered the full scope of Costco's conduct because the incorporation of the Tracking Entity' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Costco was disclosing and allowing the interception of such information to these third parties.

112.   The earliest Plaintiffs and Class Members could have known about Costco's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

113.   Plaintiffs bring this action individually and on behalf of the following Classes:

> Nationwide Class of Tracked Users: All persons in the United States whose searches and activity on the Website were intercepted, stored, and shared through the use of tracking tools (the "Class" or "Nationwide Class").

Nationwide Subclass of Tracked Users: All persons in the United States whose searches and activity on the pharmacy portion of the Website were intercepted, stored, and shared through the use of tracking tools (the "Pharmacy Class").

California Subclass of Tracked Users: All persons residing in California whose communications with the Website were intercepted, stored, and shared through the use of tracking tools (the "California Resident Class").

114. Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

115. Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into additional subclasses, or otherwise modified in any way.

116. This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

117. Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Costco's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

118. Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, visited the Website and searched for medical- or otherwise sensitive health-related products, added the items to their cart and/or purchased the items on the Website. Plaintiffs' and Class members' PHI was then disclosed and shared by Costco to third parties.

119.    <u>Adequacy of Representation (Rule 23(a)(4))</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

120.    <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

121.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a.    Whether Costco implemented the Tracking Entity' tools on the Website;

b.    Whether the Tracking Entity collected Plaintiffs' and the Class's PHI, Queries, and webpage interactions on the Website;

c.    Whether Costco's disclosures of Plaintiffs' and Class Members' PHI was without consent or authorization;

d.    Whether Costco unlawfully disclosed and continue to disclose the PHI, Queries, and webpage interactions of Tracked Users;

e.    Whether Costco's omissions regarding the practices alleged herein constitute an unfair and/or deceptive practice; and

CLASS ACTION COMPLAINT

f.    Whether Costco's disclosures were committed knowingly.

122.    Information concerning Costco's Website data sharing practices is available from Costco's or third-party records.

123.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

124.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Costco.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

125.    Costco has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

126.    Costco has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

127.    Given that Costco's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
### (On Behalf of the Classes)

128.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

129.    Plaintiffs bring this claim individually and on behalf of the Class.

130.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any

telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code Section 631(a).

131.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); see *Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

132.    The Website, including the tracking tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

133.    Within the relevant time period, Plaintiff and members of the Class used the search function to communicate Search Terms to Costco, with the expectation of receiving search results provided by Costco.

134.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications

of Plaintiffs and the putative Class Members, contemporaneous with the communications transit through or passing over any wire, line, or cable or with the communications sending from or being received at any place within California.

135.   The information collected by the Tracking Entity was not for the sole benefit of the Website.

136.   Plaintiffs and members of the Class did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

137.   The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## COUNT II

### BREACH OF IMPLIED CONTRACT
### (On Behalf of the Classes)

138.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

139.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Costco.

140.   When Plaintiffs and Class Members provided their PHI to Costco, they entered into an implied contract pursuant to which Costco agreed to safeguard and not disclose their PHI without consent.

141.   Plaintiffs and Class Members would not have entrusted Costco with their PHI in the absence of an implied contract between them and Costco obligating Costco to not disclose PHI without consent.

142.   Plaintiffs and Class Members would not have used the Website in the absence of an implied contract between them and Costco obligating Costco to not disclose PHI without consent.

143.   Costco breached these implied contracts by disclosing Plaintiffs' and Class Members' PHI without consent to third parties like Facebook.

CLASS ACTION COMPLAINT

144.   As a direct and proximate result of Costco's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of PHI.

145.   Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Costco's 's breach of implied contract.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff Scott and the Pharmacy Class)

146.   Plaintiff Scott incorporates the preceding paragraphs as if fully set forth herein.

147.   In light of the special relationship between Costco and Plaintiff Scott and Pharmacy Class Members, whereby Costco became a guardian of Plaintiff Scott's and Pharmacy Class Members' PHI, Costco became a fiduciary by its undertaking and guardianship of the PHI, to act primarily for the benefit of their customers, including Plaintiff Scott and Pharmacy Class Members: (1) for the safeguarding of Plaintiff Scott's and Pharmacy Class Members' PHI; (2) to timely notify Plaintiff Scott and Pharmacy Class Members of disclosure of their PHI to unauthorized third parties; and (3) to maintain complete and accurate records of what Tracked User information (and where) Costco did and does store and disclose.

148.   Costco had a fiduciary duty to act for the benefit of Plaintiff and Pharmacy Class Members upon matters within the scope of this relationship, in particular, to keep private and not disclose the PHI of the Tracked Users.

149.   Costco breached their fiduciary duties to Plaintiff Scott and Pharmacy Class Members by failing to keep their PHI confidential and by disclosing it to third parties.  Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by failing to ensure the confidentiality and

integrity of electronic PHI Costco received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

150. Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

151. Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by failing to ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 C.F.R. § 164.306(a)(4).

152. Costco breached its fiduciary duties owed to Plaintiff and Pharmacy Class Members violation of 45 C.F.R. § 164.308(b) by failing to obtain satisfactory assurances, including in writing, that their business associates and/or subcontractors would appropriately safeguard Plaintiff Scott's and Pharmacy Class Members' PHI.

153. Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

154. Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1).

155. Costco breached its fiduciary duties owed to Plaintiff Scott and Pharmacy Class Members by impermissibly and improperly using and disclosing

PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq*.

156.   Costco breached its fiduciary duties to Plaintiff Scott and Pharmacy Class Members by otherwise failing to safeguard Plaintiff Scott's and Pharmacy Class Members' PHI.

157.   As a direct and proximate result of Costco's breach of its fiduciary duties, Plaintiff Scott and Pharmacy Class Members have suffered and will suffer injury, as described above.

## COUNT IV

### INVASION OF PRIVACY
**(On Behalf of Plaintiffs and the California Resident Class)**

158.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

159.   Plaintiffs bring this claim individually and on behalf of the members of the proposed California Resident Class against Costco.

160.   Plaintiffs and members of the California Resident Class have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various Internet sites without being subjected to wiretaps without Plaintiffs' and California Resident Class Members' knowledge or consent.

161.   Within the relevant time period, by implementing the tracking tools on the Team Websites, Defendant intentionally invaded Plaintiffs' and California Resident Class Members' privacy rights under the California Constitution, and procured the Tracking Entity to do so.

CLASS ACTION COMPLAINT

162.    Plaintiffs and members of the California Resident Class had a reasonable expectation that their communications and other data would remain confidential and that Defendant would not install wiretaps on the Team Websites.

163.    Plaintiffs and members of the California Resident Class did not consent to any of Defendant's actions in implementing the tracking tools on the Team Websites.

164.    This invasion of privacy is serious in nature, scope, and impact.

165.    This invasion of privacy constitutes an egregious breach of the social norms underlying the privacy right.

166.    Plaintiffs and members of the California Resident Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Costco, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

(b)    For an order declaring that the Costco's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Costco to immediately (i) remove the tracking tools from the Website or (ii) add, and obtain, the appropriate consent from Tracked Users;

(e)    For damages in amounts to be determined by the Court and/or jury;

(f)    An award of statutory damages or penalties to the extent available;

CLASS ACTION COMPLAINT

(g)     For Costco to pay $2,500.00 to Plaintiffs and members of the Class, as provided by CIPA, Cal. Penal Code § 631(a);

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 18, 2023                **GLANCY PRONGAY & MURRAY**

By: */s/ Marc L. Godino*
Marc L. Godino (SBN 182689)
Jonathan M. Rotter (SBN 234137)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Phone: (310) 201-9150
Fax: (310) 432-1495
Email: mgodino@glancylaw.com
Email: jrotter@glancylaw.com

Mark S. Reich*
Courtney Maccarone*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming

CLASS ACTION COMPLAINT